39251. PATTILLO v. THE STATE.

GREGORY, Justice.
The defendant was convicted of the murder of Shirley Owens and sentenced to life imprisonment. The victim's body was discovered at approximately 1:30 a.m. on November 14, 1981 on Chick-Fil-A Road in South Fulton County. Medical testimony at trial indicated the victim had sustained a facial gunshot wound from a range of no more than five inches. The bullet passed through the victim's right cheek and lodged in her spinal cord, resulting in almost immediate death. The medical examiner expressed his opinion that death had occurred within twenty-four hours of discovery of the body.

A firearms examiner from the State Crime Laboratory testified that in his opinion the bullet which killed the victim had been fired from a .38 Colt. The murder weapon was never recovered.

William Polnett testified that on the morning of November 13, 1981, the defendant appeared unexpectedly at his home. Polnett had not seen the defendant for several months prior to this visit, but the two men did not discuss where the defendant had been during this time. The defendant used Polnett's telephone and left "about five minutes later." Polnett observed that the defendant was driving a red Mercedes at this time. During the course of the day the victim telephoned Polnett "three or four times." Initially she was attempting to locate the defendant; when she learned Polnett had

seen him, she instructed Polnett to inform the defendant that "if he didn't return the car to her, she would contact the police." With Polnett serving as an intermediary, the defendant and victim agreed to meet at Polnett's home on the evening of November 13. Polnett testified that while the 7:30 p.m. meeting was "cool," neither the defendant nor the victim appeared to be upset; they departed about 9:00 p. m. with other guests in the Polnett home. Polnett was not aware of whether the couple left in the same automobile.

Diane John, the victim's cousin, testified that the victim contacted her from Miami, Florida at approximately 9:00 a.m. on November 13, indicating she would be flying in to Atlanta that day. The victim again telephoned Mrs. John, a Delta Air Lines employee at the Atlanta airport, at approximately 4:30 p. m. At this time the victim had already arrived at the Atlanta airport. The victim indicated to her cousin that she faced an "emergency," but offered no explanation of the circumstances; the victim then asked to borrow Mrs. John's car. Mrs. John again spoke to the victim at approximately 8:30 p.m. During this conversation the victim stated she would leave Mrs. John's car outside the Delta security gate; when Mrs. John returned to her car around 9:30 p.m., she discovered that its front end had been wrecked. The keys were in the front seat and the victim was no where to be found.

Wanda Johnson testified that on "either November 13 or 14 or 15" she drove with the defendant in the early morning hours to the home of Beverly Topps to deliver a stereo system and Betamax for Miss Topps to sell. Johnson testified that the defendant had spent the previous night at her home. They drove to Miss Topps' house in a red Mercedes bearing a Florida license plate. The defendant informed Johnson that the Mercedes belonged to a friend of "a lady friend of his" who lived in Florida, but that he and the "lady friend had mapped out a plan to get the car." Johnson also testified that the defendant removed the Florida license plate from the Mercedes and placed it in the back seat of her car, but that it "disappeared" prior to trial.

Beverly Topps, a self-professed "professional shoplifter," testified that the defendant came by her house at 8:00 a.m. on November 13. At this time the defendant was driving a red Mercedes and Wanda Johnson was in the car with him. The defendant told Topps "he had just come back to the city" and asked her to sell a stereo and Betamax for him. The defendant returned, alone, to Topps' home at 10:00 p.m. for 15-20 minutes, discussing a matter out of Topps' earshot with his brother. Topps testified the defendant returned for the third time that day at 11:00 p.m. carrying a brown suede jacket and beige purse. Topps testified she recognized the

handbag as one she had seen the victim use. At this time the defendant told Topps he "had had to off Shirley."[1] When Topps told him she did not want to hear about it, the defendant left.

Willie Mae Pitts testified that she permitted the defendant to remain in her home from November 15 to December 3. During this time he parked a red Mercedes in her backyard. Pitts testified the defendant told her the "car belonged to a man in Miami and that [the defendant] had taken the car." The defendant also stated to Pitts that "[he] had killed a girl . . . did it clean. [He] shot her in the head."

Both Wanda Johnson and Willie Mae Pitts testified that they had observed the defendant in possession of a gun at various times, but neither was able to identify the make or calibre of the weapon. Harry S. Harold, an acquaintance of the defendant, testified that he had, on past occasions, seen the defendant in possession of a .38 revolver.

A computer check of the victim's police record showed she was sought by law enforcement officers in Dade County, Florida on suspicion of burglary and theft of a 1974 red Mercedes, reported stolen on November 11, 1981. When Fulton County police arrested the defendant at the home of Willie Mae Pitts, they discovered the Vehicle Identification Number of the Mercedes parked in her backyard matched the VIN of the automobile reported missing in Dade County, Florida. The defendant had the keys to the Mercedes in his possession at the time of arrest.

In his defense the defendant offered the testimony of Chris Hopkins that the defendant had been with her from 9:40 p.m. on November 13 until noon on November 14. Hopkins also testified that the defendant spent the night of November 16 with her.

(1) The defendant first argues that the evidence is not sufficient to support the judgment. However, viewing, as we must, the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the defendant guilty of the murder of Shirley Owens beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979). "[W]here the jury is authorized to find that the evidence, though circumstantial, was sufficient to exclude every reasonable hypothesis save that of guilt, the appellate court will not disturb that finding, unless the verdict of guilty is unsupportable as a matter of law." *Staymate v. State,* 237 Ga. 661 (229 SE2d 421) (1976). See OCGA § 24-4-6 (Code Ann. § 38-109).

The defendant argues he "successfully attacked the credibility"

---

[1] Topps testified that in "street" parlance, the defendant's expression meant "that he had to kill her."

of Beverly Topps and Willie Mae Pitts by showing that they are superstitious[2] and that Topps is an "admitted thief." Consequently, he maintains that the testimony of these two witnesses was "unbelievable as a matter of law." However, the credibility of a witness is a matter to be determined by the jury under proper instructions from the court. OCGA § 24-9-85 (Code Ann. § 38-1806); *Cooper v. State,* 249 Ga. 58 (287 SE2d 212) (1982). The trial court in this case gave an appropriate charge on the factors to be considered by the jury in determining the credibility of witnesses and reconciling inconsistencies in their testimony. We find no error.

(2) Defendant argues that the trial court's charge on the defense of alibi impermissibly shifted the burden of proof to him by suggesting to the jury that the defendant was required to prove he was not at the scene of the crime. We do not agree. We also point out that when the trial court inquired whether defendant had any exceptions to the charges as given, he responded, "we prefer our charges as opposed to the court's charges. That's the only exception we take."

The trial court instructed the jury that the defense of alibi "involves the impossibility of the accused's presence at the scene of the offense at the time of its commission. The presence of the defendant at the scene of the crime alleged or his involvement as a co-conspirator is an essential element of the crime set forth in the indictment, and the *burden of proof as to such issue rests upon the state, as I instructed you already.* Any evidence in the nature of alibi should be considered by the jury in connection with all of the facts in the case, and if upon considering the evidence as a whole the jury should entertain a reasonable doubt as to the guilt of the accused, they should acquit him of the offense charged." (Emphasis supplied.) The trial court had earlier instructed the jury as to the state's burden of proving each essential element of the crime beyond a reasonable doubt.

Considering the trial court's charge as a whole we do not find that it shifted the burden of proof to the defendant; rather the charge squarely places the burden of proving defendant's presence at the scene of the crime on the state. Further, a virtually identical charge was approved by this court in *Robinson v. State,* 229 Ga. 319, 320-321

---

[2] On cross-examination Topps admitted that she sleeps with an egg under her bed "to ward off evilness," keeps a dollar over her door "to bring money in the house," reads her horoscope daily and does not venture out of her house on the thirteenth of each month. Both women testified that they had, on occasion, consulted "spiritual advisors."

(191 SE2d 41) (1972).
*Judgment affirmed. All the Justices concur.*

DECIDED FEBRUARY 3, 1983.

*Franklin, Axam & Ashburne, Tony L. Axam, Lisa D. Cooper,* for appellant.
*Lewis R. Slaton, District Attorney, Joseph J. Drolet, Assistant District Attorney, Michael J. Bowers, Attorney General, Mary Beth Westmoreland, Assistant Attorney General,* for appellee.